Butler, J.
Plaintiffs Charles Mosesian (“Mosesian”) and Coolidge Avenue 125 Corporation (“125 Corp.”) bring this action against defendant Franki Foundation Corporation (“Franki”) alleging breach of warranty and negligence. Franki moves for summary judgment on the grounds that plaintiffs have failed to bring this action within the six-year period allowed under the *630 applicable statute of repose, G.L.c. 260, §2B and have failed to state a claim as to Counts I and II (breach of contract counts). For the following reasons, Franki’s motion for summary judgment is DENIED in part, and ALLOWED in part.
BACKGROUND
The following undisputed facts are taken from the pleadings and affidavits.
In the beginning of 1986, Mosesian was the developer, and 125 Corp. was the developer and general contractor, of Horizon East Condominiums, an eighty-four residential unit project in Watertown, Massachusetts. On July 2, 1986, Mosesian accepted Franki’s written proposal to provide the labor, materials and equipment for the installation of pressure injected footings (“PIFs") that would provide the support for the condominiums. Franki provided the specifications of the PIFs, including that each would have a weight capacity of up to 120 tons. In addition, the contract provided certain guarantees regarding the performance of the PIFs.[2] Franki began work on June 19, 1986, and by August 11, 1986, the installation was complete.
After Franki completed its work, Mosesian requested a letter describing the contractual guarantee. In response, on November 24, 1986, Franki sent a letter that described the guarantee as follows:
We guarantee that our foundation units will satisfactorily support the loads shown in the contract plans and specifications. Where cohesive soil subject to consolidation occurs below the agreed bearing stratum for our units, we assume responsibility for satisfactoiy transfer of structural loads to the bearing stratum, but the purchaser shall predict and design for possible long term settlement of the bearing stratum itself.
If our foundation units do not perform in accordance with our guarantee, we will at our cost, repair or replace all resultant structural damages.[3]
We shall not be held to this guarantee in the event of (i) loading in excess of or of a type differing from that shown in the plans and specifications or (ii) interference, whether of natural or human origin, with the vertical or lateral support provided to our foundation units by the sub-soil. This guarantee on workmanship and materials of a period of one (1) year past acceptance by the owner.
(Emphasis added.)[4]
During Franki’s work, Mosesian questioned whether the piles were being driven deeply enough and whether the machine being used by Franki was adequate for the job. In response to his questions, Robert Barry, vice president of Franki, assured Mosesian that the piles were being driven to the proper depths and that the pile driving machine was adequate. In 1987, Mosesian completed payment on Franki’s invoices.
Two years after Franki had completed its work, an occupancy permit was issued by the Town of Water-town on August 12, 1988, for six of the eighty-four units, including unit 101. The occupancy permit was issued on a hardship basis to accommodate six prospective purchasers who had entered into purchase agreements for condominium units and who had either sold their prior residences or given notice to their landlords in reliance on the purchase agreements. These occupants were allowed to occupy the six emits after the partial occupancy permit was issued: however, they did not pay rent for the use of the emits and did not own the units at that time.[5]
As of August 12, 1988, the date of issuance of the partial occupancy permit, the following work still needed to be completed: engineering and welding work, unrelated to the subsequently discovered foundation problems, to ensure that the condominiums satisfied the applicable wind and earthquake resistance standards: installing hand railings throughout the condominiums: and carpeting the common areas. The full occupancy permit was issued on November 21, 1988.[6]
In late 1993, Mosesian noticed various cracks on the northeastern corner of the building and what appeared to be unusual settlement of unit 101, which was on the first floor of the building. In early 1994, Mosesian hired a consultant to investigate the cause and extent of the problems. The consultant determined that one section of the foundation had settled between two and two and one-half inches.[7]
Franki was informed about the settlement and it subsequently inspected the building. After discussions with Mosesian, Franki refused to correct the settlement problem. The work needed to repair the settlement and the resultant damage has not been completed.
On November 18, 1994, this complaint was filed, alleging the following causes of action:
Count 1: Mosesian v. Franki:
Breach of Contract
Count 11: 125 Corp. v. Franki:
Breach of Contract (125 Corp. as intended third-party beneficiaiy)
Count III: Mosesian and 125 Corp. v. Franki: Negligence
Count IV: Mosesian and 125 Corp. v. Franki: Indemnification
Count V: Mosesian and 125 Corp. v. Franki: Contribution
DISCUSSION
Summary judgment must be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears *631 the burden of affirmatively demonstrating the absence of a triable issue and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment.” Id. at 17. The opposing party cannot rest on its pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
Defendant seeks summary judgment, arguing that G.L.c. 260, §2B bars all counts because all claims sound in tort, and alternatively, that Counts I and II, alleging breach of warranty, do not state a claim because the warranty provided to the plaintiffs was for one year only.[8] Plaintiffs counter that Section 2B is inapplicable to Counts I, II, IV and V because they are contract claims, and that alternatively, if Section 2B is applicable, the claims are still timely because the statute did not begin to run until the full occupancy permit was issued on November 21, 1988.
Statute of Repose — G.L.c. 260, §2B
General Laws c. 260, Section 2B provides in pertinent part that
Action of tort for damages arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property, . . . shall be commenced only within three years next after the cause of action accrues; provided, however, that in no event shall such actions be commenced more than six years after the earlier of the dates of: (1) the opening of the improvement to use; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner.
G.L.c. 260, §2B.[9]
Plaintiffs filed this action on November 18, 1994. Thus, if “the improvement” was (i) open to use or (ii) substantially complete and the owner took possession for occupancy prior to November 18, 1988, then any of plaintiffs’ claims sounding in tort are barred. G.L.c. 260, §2B.
Tort Claim (Count III)
Franki argues that the PIFs are “the improvement to real property," that the PIFs were completed on August 11, 1986, and thus, that the statute of repose bars plaintiffs’ tort claims. This interpretation is not persuasive.
The current version of Section 2B runs after the earlier of “(1) the opening of the improvement to use; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner.” Interpreting the main language of this section, especially in comparison to the earlier version of the statute,[10] Section 2B must be interpreted to commence at the same time for a professional such as Franki who provides a service early in a project, as for one who brings a project to its substantial completion. “Elementary rules of statutory construction require [the court] to look to the statutory language itself as the principal source of insight into the legislative purpose.” Klein v. Catalano, 386 Mass. at 705, citing Hoffman v. Howmedica, Inc., 373 Mass. 32, 37 (1977). In addition, the words of the statute are construed according to their “usual and natural meaning." Klein, 386 Mass. at 705. Thus, in the present case, “the improvement” is the condominium building and not the PIFs.
Alternatively, Franki contends that if the condominium project constitutes “the improvement,” then the building was open to use on August 12, 1988, the date that a partial occupancy permit was issued by the Town of Watertown and thus, plaintiffs’ tort claims are barred by Section 2B’s six-year limitation.
Plaintiffs contend that the partial occupancy permit was issued because of exigent circumstances for six of the eighty-four units and that, for purposes of Section 2B, the building was not “open to use” or “substantially complete” until the town issued the full occupancy permit on November 21, 1988.
The plain language of Section 2B dictates that the statute commenced to run when the six condominium units were open for occupancy, in August 1988, resulting in “the opening of the improvement to use.” “[WJhere the language of a statute is plain there is no room for speculation as to its meaning or its implication. The Legislature must be presumed to have meant what the words plainly say, and it also must be presumed that the Legislature knew preexisting law and the decisions of [the Supreme Judicial C]ourt.” Condon v. Haitsma, 325 Mass. 371, 373 (1950).
In the present case, an occupancy permit was issued for six condominium units on August 12, 1988 and later that month, the units were occupied. Thus, despite the exigent circumstances surrounding the partial occupancy of the building, it was open to use as of August 12, 1988. Because the complaint was filed on November 18, 1996, more than six years after the commencement of Section 2B, any of plaintiffs’ claims sounding in tort are barred. Certainly, Count III, alleging negligence, sounds in tort and is barred.
Breach of Contract’s Express Warranty (Counts I and II)
Breach of implied warranty claims are considered tort-based and thus, subject to Section 2B. Kingston Housing Authority v. Sandonato & Bogue, Inc., 31 Mass.App.Ct. 270, 273-74 (1991). On the other hand, breach of express warranty claims have been held to be contract-based and, thus, not subject to Section 2B. Anthony’s Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc., 396 Mass. 818, 823 (1986). See Klein v. Catalano, 386 Mass. 701, 720 (1982).
*632 Franki urges the court to rule that plaintiffs’ breach of warranty claims sound in tort. For this proposition, Franki relies upon Kingston Hous. Auth., 31 Mass.App.Ct. at 273-74. The Kingston court held that the plaintiffs claim alleging intentional deviation from contract specifications to be substantially similar to the tort of misrepresentation with the intent to deceive and thus, barred by Section 2B. Id. Unlike in the present case, however, the Kingston court found that the breach of warranty claim was just another label for negligent workmanship. Id. at 274. The court went on to say that one may imagine an express warranty in a contract or a good faith deviation from specifications. Id. “Because the standard of performance is set by the defendants’ promises, rather than imposed by law, an express warranty claim is and generally has been understood to be an action of contract, rather than of tort.” Anthony’s Pier Four, Inc., 396 Mass. at 822, citing W. Prosser and W. Keeton, Torts §92, at 656, 657 (5th ed. 1984). Thus, “(i]f a [construction or] design professional expressly warrants a certain result, ‘the plaintiff may maintain an action for breach of express warranty.’ ” Anthony’s Pier Four, 396 Mass. at 822, quoting Klein, 386 Mass. at 720.
Here, Franki made the following express promises: (i) that it would supply 235 pressure injected footings each with a capacity of up to 120 tons that, collectively, would satisfactorily support the loads shown in the building plans and specifications; (ii) that it would assume responsibility for the satisfactory transfer of structural loads to the bearing stratum; and (iii) that the work and materials would comply with project specifications, applicable codes and good engineering practice.
Franki’s three express promises impose a higher duty on Franki than the implied promise to exercise the standard of reasonable care required of members of the defendant’s profession. See Anthony’s Pier Four, 396 Mass. at 823; Klein, 386 Mass. at 719, 720. Further, in response to inquiries Mosesian made during the work period, Franki expressly warranted that its work was fit for its intended purposes. See Anthony’s Pier Four, 396 Mass. at 823.
As a result, the statute of repose is inapplicable.
Indemnification (Count IV)
Franki contends that it is entitled to summary judgment on the indemnification claim because this claim sounds in tort and therefore, is barred by Section 2B. Specifically, Franki argues that unlike claims based on express contractual indemnity clauses, common law indemnification claims sound in tort.
Indemnification claims may be based on a tort-based theory or one that is contract-based. Roderick v. Bugge, 584 F.Sup. 626, 630 (1984) (cross claimant relied on “implied contractual right to indemnity [arising from the] breach of an implied warranty of workmanlike performance”).
In the present case, plaintiffs allege in their indemnification claim that as general contractor of the Horizon East Condominium project, they may be found liable to the condominium association for Franki’s allegedly defective construction. As in Roderick, plaintiffs rely on a theory of implied contractual right to indemnity arising from Franki’s alleged breach of an express warranty. The court agrees that an indemnification claim based on an alleged breach of express warranty is not subj ect to the time limitation of Section 2B.
Contribution (Count I)
Contribution is available only “where two or more persons become jointly liable in tort.” Dighton v. Federal Pacific Elec. Co., 399 Mass. at 691; G.L.c 23IB, §l(a). “Without liability in tort, there is not right to contribution,” Dighton, 399 Mass. at 391. In Dighton, the Court upheld as proper the dismissal of a claim for contribution as barred by Section 2B. Thus, plaintiffs’ claim for contribution must fail.
ORDER
For the foregoing reasons, Franki’s motion for summary judgment is DENIED as to Counts I, II and IV, and ALLOWED as to Counts III and V.

 Specifically, Franki’s proposal states that it would “furnish labor, material and equipment and install . . . 235 Pressure Injected Footings (PIFs) of up to 120 tons individual capacity . . . The PIFs we propose to install will have their shafts encased in a 16 inch diameter permanent steel casing and will be filled with concrete attaining a 28 day compressive strength of 4000 psi.”
The contract incorporated an attached printed sheet of general working conditions including the following provision:
13. GUARANTEE
a. Workmanship and materials: Our workmanship and materials will comply with project specifications, applicable codes and good engineering practice.
b. Foundation Performance: We guarantee that our foundation units will satisfactorily support the loads shown in the contract plans and specifications. Where cohesive soil subject to consolidation occurs below the agreed bearing stratum for our units, we assume responsibility for satisfactory transfer of structural loads to the bearing stratum, but the purchaser shall predict and design for possible long-term settlement of the bearing stratum itself.
We shall not be held to this guarantee in the event of (i) loading in excess of or of a type differing from that shown in the plans and specifications or (ii) interference, whether of natural or human origin, with the vertical or lateral support provided to our foundation units by the sub-soil,

 This sentence did not appear in the printed terms and conditions. Instead, there was a blank space which appeared to have been caused by “whiting out” this sentence.

 With the significant exceptions of the two additional sentences mentioned above, the guarantee language in the November 24, 1986 letter was identical to the guarantee contained in the contract itself. The additional guarantee language was negotiated or agreed to by Mosesian, and was supplied three months after Franki completed its portion of the project. The underlined sentence, limiting the guarantee to one year after acceptance, did not appear in the original printed additional terms and conditions page of the contract, *633 and, unlike the other added sentence, referenced in the footnote above does not appear to have been lifted from the contract.

 The closings and transfers of ownership for condominium units began in January 1989.

 Occupancy was only 62% in May 1990. In September 1991, the building was 86% occupied.

 In 1997, subsurface soil boring tests were performed which showed that the PIFs in the vicinity of the settlement were installed in fill material consisting of rubber, trash, wood, and metal, rather than an acceptable bearing stratum such as compact sand or gravel. Two of Mosesian’s consultants maintain that the failure to install the PIFs within a suitable bearing stratum is the reason for the excessive settlement at the site.

 As noted supra at n.4, the alleged one-year limitation on the warranties is not contained in the contract dated June 12, 1986 and fully executed on July 2, 1986. The basis of the one-year limitation appears to be a letter from Franki to Mosesian dated November 24, 1986, which is more than three months after the PIFs were installed and more than five months after the parties signed their contract. Thus, Franki’s contention that the warranties provided in the contract are limited to one year is without merit.

 Section 2B is applicable to Franki’s work for the plaintiffs. See, eg., Snow v. Harnischfeger, 12 F.3d 1154 (1st Cir. 1993) (Section 2B protects engineers, architects and contractors for tort actions arising from an improvement to real property, that is, a permanent betterment that enhances capital value and that involves the expenditure of labor or money).

 Cf. G.L.c. 260, §2B, as originally enacted in 1968, St. 1968, c. 612. That version of Section 2B barred tort actions from being brought more than six years after “the performance or furnishing of [the] design, planning, construction or general administration” of an improvement to real property. Thus, as drafted in 1968, it appears that the legislature intended Section 2B to commence when each professional completed his job and not at the completion of an entire project. Klein v. Catalano, 386 Mass. 701, 705 (1982) (“The statute does not depend on the date of the improvement to real property but depends on the time the design, planning, construction, or general administration of the improvement to real property was furnished”). Section 2B was amended in 1985 by St. 1984, c. 484, §53, January 7, 1985.